IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NORA L. JONES                    :

    v.                    :        Civil Action No. DKC 08-0304

GIANT OF MARYLAND, LLC,          :
et al.
                                 :

## MEMORANDUM OPINION

Presently pending and ready for resolution in this employment discrimination case are: (1) a joint motion to strike filed by Defendants Giant of Maryland, LLC ("Giant"), and United Food & Commercial Workers, Local 400 ("UFCW") (paper 85); (2) a motion for summary judgment filed by Defendant Giant (paper 72); and (3) a motion for summary judgment filed by Defendant UFCW (paper 71). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the motion to strike will be denied and both motions for summary judgment will be granted.

## I.   Background

### A.   Factual Background

The following facts are either uncontroverted or construed in the light most favorable to Plaintiff, the non-moving party. Plaintiff Nora Jones, a 65 year old African-American female, was

hired as a clerk in the Bakery Department of one of Defendant Giant's retail grocery stores in March 1978. (Paper 72, at 3). Giant is a grocery chain with stores in Maryland, the District of Columbia, and Virginia. Defendant UFCW is the trade union representing approximately 10,000 Giant employees in collective bargaining with Giant management.

Based on her date of hire, Plaintiff was classified as a Tier 1 employee. (Paper 82, at 1). Everyone hired prior to October 23, 1983 is considered a Tier 1 employee and is paid according to Schedule A of the Collective Bargaining Agreement ("CBA"). (Paper 72, at 22). Tier 1 status connotes seniority within the company and is unrelated to the employee's age, but because these employees are covered under Schedule A of the "old" CBA, they are sometimes referred to as "old contract people." (*Id.* at 22-23).

In 1985, Plaintiff was promoted to Bakery Manager. Over time, Plaintiff worked as Bakery Manager for a number of stores, including Store No. 162 in Clinton, Maryland, where she was transferred in 2004. As Bakery Manager, Plaintiff reported to Store Manager Patty Barnes and Assistant Store Manager Kelly Mason. (Paper 72, at 3). She also reported to a Bakery Specialist, who had responsibility for 10-12 stores in a district, and who, in turn, reported to a Bakery Sales Manager.

The Store Manager reported to the District Manager. Around October 2006, John Hicks became District Manager for District 52, which included the Clinton Store. (*Id.*) The Union Service Representative for Store 162 was Gregory Burton. His responsibilities included representing Giant employees and enforcing the collective bargaining agreement between Giant employees and company management.

Bakery Managers are responsible for the efficient and effective operation of the Bakery Department, and, as Department Managers, for generating profit. (*Id.* at 3-4). As baking is done off-site, Bakery Managers order the products they need and expect to be able to sell. Product that is not sold must be thrown away and represents a loss to the company. This loss is referred to as "shrink." (Paper 72, at 4). Plaintiff's objective was to maximize sales while minimizing "shrink." One way a Bakery Manager encourages sales is through creating an attractive display and maintaining a clean department. Plaintiff predominantly worked alone in performing these duties but did have the part-time help of an assistant, Sheila Wright.

Giant has a written policy regarding the shelf life of bakery products. (Paper 71, at 7). The policy states that "[u]nder no circumstances can an item be sold beyond the sell by date that has been established and placed on an item." (Paper

72, at 6).  The date marked on a product indicates the last day
it may be sold.  (Paper 71, at 7).  In order to avoid throwing
out food, company policy states that products should be reduced
in price before the sell date.  (*Id.*).

The bakery department in the Clinton store contains about
500 items and is much smaller than the grocery department, which
carries approximately 400,000 to 500,000 items.  In contrast to
the bakery department, where the Manager is expected personally
to monitor the inventory, the grocery department is maintained
through periodic audits intended to discover and remove out-of-
date products.  (Paper 72, at 14; Paper 87, at 19).

On February 23, 2004, Bakery Specialist Suzette Manns
inspected Plaintiff's bakery and made a list of problem areas.
Ms. Manns' report specifically noted that countertops, the bread
slicer, refrigerated case vents, the floor cake freezer, and the
muffin case all needed cleaning.  (Paper 72, at 7).  Tables on
the sales floor were not neat, bag holders were empty, and
single serve items were not available for customers.  (*Id.* at
8).

Ms. Manns returned on March 7, 2004 and was "unhappy" with
what she found.  (*Id.* at 8).  Her new report included
observations that the muffin case had not been cleaned, signs on
the tables were missing or dusty, the tables themselves were not

clean, out-of-date eggs were found in the cooler, the floors were dirty, and twenty packages of cookies should have been reduced in price. (*Id.*). As a result of the poor inspections, Plaintiff received a disciplinary notice on March 9, 2004, noting the unsatisfactory conditions and advising that "[t]he next incident of this nature will lead to further disciplinary action." (*Id.* at 9). Plaintiff did not grieve this action. (*Id.*).

In July 2006, Plaintiff complained to Union Business Service Representative Greg Burton that Giant had violated her contract by denying her four and one-half hours of overtime she should have received because of her seniority status. (Paper 71, at 17-18). Mr. Burton filed a written grievance for her. After investigation, Mr. Burton determined Plaintiff was not entitled to the overtime and did not pursue the grievance further. (*Id.* at 18).

At an unspecified time, Plaintiff and Shop Steward Thomas Schied told Mr. Burton that Assistant Store Manager Kelly Mason said she wanted to get rid of "Tier 1 or older employees." (Paper 71, Attach. 15, at 94-95). Plaintiff claims that employees Loretta Lyles and Laura Steinbach heard Ms. Mason say this. (Paper 71, at 19). Ms. Lyles, however, denied hearing this statement. Ms. Steinbach was unsure if she heard the

statement, but if she did hear it, she believed Ms. Mason was referring to seniority and not age. (*Id.*). Mr. Schied said only that Ms. Mason talked to him about wage rates of Tier 1 and Tier 2 employees. (*Id.*). Mr. Burton took no action, both because the comment was hearsay and because he received no indication that Ms. Mason had acted on her alleged statement. (*Id.*).

On November 10, 2006, Store Manager Patty Barnes issued Plaintiff a disciplinary notice for having gross profits of 37 percent for the month of October 2006. (Paper 72, at 10). This was 18 percent below the district average of 55 percent. (*Id.*). The notice warned,

> This is an example of poor job performance as it relates to shrink in the bakery dept. Any further acts of this nature from poor job performance will result in additional disciplinary action including being removed from position as a Bakery Manager.

(*Id.*). Plaintiff never filed a grievance about this action. (*Id.* at 11). She did, however, talk to Mr. Schied about filing a grievance. (Paper 71, at 6). Plaintiff mistakenly thought that her refusal to sign the Disciplinary Notice would start the grievance process. (*Id.*). Neither Mr. Schied nor Plaintiff told Mr. Burton about the Disciplinary Notice or Plaintiff's desire to file a grievance and, as a result, Mr. Burton never filed a grievance. (*Id.*).

In October or November 2006, Plaintiff received packages of Sinbad Hanukah macaroon cookies to sell in anticipation of the holiday. (Paper 72, at 12-13). The cookies did not sell and remained in Plaintiff's inventory. In February, Plaintiff was told by either Store Manager Patti Barnes or District Manager Hicks to put the macaroons on a promotional table for reduced sale. On February 19, 2007, District Manager Hicks visited the Clinton store and found a display table with "very dusty" bags of macaroons that were four days out of date. (*Id.* at 13). There was no sale sign or notice of price reduction. (*Id.*). Plaintiff claimed that she arranged for the price of the macaroons to be reduced at the cash register by asking employee Lisa Simpson to link a coupon in the computer. (Paper 72, Attach. E, at 221-22). The link apparently failed, and the computer continued to ring up the macaroons at full price. (Paper 72, at 17 n.15). Regardless of Plaintiff's efforts to reduce the price, the presence of outdated food on the sales floor violated company policy, and Mr. Hicks ordered Assistant Store Manager Mason to suspend Plaintiff pending investigation. The loss to the company from the cookies was $359.38. (*Id.* at 15).

Article 10.2 of the governing Collective Bargaining Agreement ("CBA") allows the employer to "discharge or

discipline any employee for good cause." (Paper 71, at 7).
Less severe performance problems are governed by CBA § 10.3,
which allows an employee one written notice of unsatisfactory
work performance before disciplinary action. A written notice
expires after nine months. (*Id.* at 8).

Although Plaintiff received the 2006 Disciplinary Notice
only three months before her suspension in 2007, Mr. Hicks was
not aware of the Notice at that time of her suspension. (*Id.* at
12 n.3). Mr. Hicks had observed on multiple visits, however,
that the Bakery was "in bad shape" and "not where it needs to
be." (Paper 72, at 11). Mr. Hicks suspended Plaintiff without
progressive discipline because of the severity of the offense of
selling out-dated bakery products. (Paper 71, at 8). Keeping
out-of-date merchandise on the sales floor was, in fact, a
terminable offense. (*Id.* at 10).

Immediately after he left the Clinton store, Mr. Hicks
asked Human Resources Manager Robin Anderson and Bakery Sales
Manager Ben Kautz for input on the suspension. They confirmed
that Plaintiff had been performing poorly for an extended period
of time. (*Id.* at 16). Both agreed that Plaintiff should be
removed from her position as Bakery Manager. (*Id.* at 15).
Hicks decided to terminate or demote Plaintiff but postponed his
decision until after hearing Plaintiff's explanation. (*Id.*).

On February 22, 2007, per Mr. Hicks' instructions, Assistant Store Manager Kelly Mason issued Plaintiff a Disciplinary Notice and informed her of the suspension pending an investigation. (*Id.*). Following Shop Steward Schied's advice, Plaintiff called Mr. Burton and told him that she had been suspended. This was Mr. Burton's first notice of the suspension; no one from Giant had spoken with Mr. Burton about the discipline. (Paper 71, at 10). Because Plaintiff was suspended until her grievance meeting, Mr. Burton chose to call Ms. Anderson immediately to schedule a meeting rather than file a written grievance. He believed a phone call would expedite the process. (*Id.* at 11). Mr. Burton had thirty days to submit a written grievance, if necessary. (*Id.*). In preparation for the meeting, Mr. Burton interviewed Plaintiff about the incident, and she admitted that there were outdated products on the sales floor. (*Id.*).

The grievance meeting was held on March 2, 2007. (*Id.*). Ms. Anderson and Store Manager Patty Barnes represented Giant. Mr. Burton accompanied Plaintiff. Plaintiff admitted she received the macaroons in October or November 2006. (Paper 71, at 11). She admitted the macaroons were outdated and still on the sales floor. (Paper 72, at 19). Plaintiff said that having out-of-date macaroons available for purchase was an "oversight."

(*Id.*). Ms. Barnes told Ms. Anderson that Plaintiff's "housekeeping isn't that great," the bakery floor was typically dirty, and Plaintiff's gross profit was low. (*Id.*). At the conclusion of the meeting, Mr. Burton requested Plaintiff be returned to work. (Paper 71, at 12).

After the grievance meeting, Mr. Hicks consulted with Ms. Anderson and decided to demote Plaintiff. (Paper 72, at 19). On March 5, 2007, Ms. Anderson told Mr. Burton of Mr. Hicks' decision that Plaintiff would be demoted and transferred but would retain her seniority, rate of pay, and full-time status. (Paper 71, at 13). Mr. Burton related the information to Plaintiff, who said, "okay." (*Id.*). Mr. Burton could have suggested that Plaintiff continue to pursue her grievance (paper 82, at 3), but he thought the settlement was a good one because Plaintiff had committed a terminable offense yet had kept her job and seniority (paper 71, at 13). If Plaintiff took her grievance to arbitration, she risked remaining out of work longer or losing her job. (*Id.* at 14). Plaintiff never told Mr. Burton she was dissatisfied with the settlement, nor did she ask the Union to pursue the grievance further. (*Id.* at 13-14). Instead, she agreed to the settlement and reported to work at her new location in Marlow Heights. (*Id.* at 14). Even if Plaintiff had requested that the Union pursue arbitration, it

would have declined because Plaintiff risked remaining on suspension until Giant proposed a different settlement offer. (*Id.*).

Sheila Wright, Plaintiff's assistant in the Bakery Department, replaced Plaintiff as Bakery Manager. Bakery Managers are paid the same rate regardless of contract status, and Ms. Wright was paid at the same rate as Plaintiff, despite the fact that Plaintiff was paid according to Schedule A and Ms. Wright was paid according to Schedule B. (Paper 72, at 23). Thus, Giant did not save money by removing Plaintiff and promoting Ms. Wright and Plaintiff lost no money in the demotion and transfer. (*Id.*).

Plaintiff was temporarily assigned to work as a Service Deli Clerk in Marlow Heights, retaining seniority, rate of pay, and full-time status. Shortly after her reassignment, Plaintiff called Mr. Burton to complain that she was not on the schedule. She did not mention that she was unhappy with the settlement, nor did she express a desire to pursue her grievance. (*Id.*).

On March 11, 2007, Plaintiff was transferred to a store in Bowie, Maryland, that needed additional staff. After two weeks, the Deli Manager requested that Plaintiff be transferred out of the Bowie Deli Department because of low productivity and the lack of budget for a third full-time staff member. (*Id.* at 21).

On March 25, 2007, Mr. Hicks transferred Plaintiff to a store in Dunkirk, Maryland. While at Dunkirk, Plaintiff complained to her current Shop Steward, Deborah Jameson, and a former Shop Steward, Jenny Pape, about her suspension, demotion, and transfer. (Paper 71, at 14). Ms. Jameson and Ms. Pape encouraged Plaintiff to take action herself because they were not Shop Stewards at the Clinton store and could not talk to Mr. Burton about past problems at another store. (*Id.* at 15). While at the Dunkirk store, Plaintiff received a Disciplinary Notice for unsatisfactory work performance concerning a customer complaint. (*Id.*).

Plaintiff claims that on April 25, 2007, she sent a letter to UFCW, Local 400 President C. James Lowthers. In the letter, Plaintiff stated, "I recently filed a grievance but got nothing in writing from them. I asked for a shop steward and was denied it. I feel like my civil rights have been violated!" (*Id.*). Plaintiff claims that either the Vice President Regional Director of Membership Services or the Director of Member Services called her in response. During the phone call, Plaintiff allegedly complained that she was being "forced out" because of her age and race. (*Id.* at 16). Defendant UFCW denies it received the letter or that this conversation took place. (*Id.*).

At the end of April 2007, Plaintiff went on a medical leave of absence. On June 23, 2007, she filed discrimination charges against Defendant Giant and Defendant UFCW with the EEOC alleging age and race discrimination. (Paper 83, at 4). On November 22, 2007, the EEOC issued Plaintiff a notice of right to sue letter. (*Id.*).

When she returned from medical leave in January 2008, Plaintiff was assigned to work as a Bakery Clerk at Store No. 384, which was closer to Plaintiff's home than the Dunkirk store and needed help in the bakery. (Paper 72, at 21). Plaintiff still works in Store No. 384 as a Bakery Clerk.

### B.  Procedural History

Plaintiff filed her original complaint on February 4, 2008. (Paper 1). On November 12, 2008, Plaintiff filed an amended complaint alleging disparate discipline because of her race and age in violation of 42 U.S.C. § 1981 ("Section 1981") and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621, *et seq.* (Paper 21). A scheduling order was entered on December 29, 2008, setting the discovery deadline for May 13, 2009. (Paper 30). After several extensions of the discovery deadline, the parties filed a joint status report on July 27, 2009. (Paper 67). Defendant UFCW filed a motion for summary judgment on September 24, 2009. (Paper 71). Defendant Giant

13

filed its motion for summary judgment the following day. (Paper 72). Plaintiff's opposition papers in response to these motions were due on October 13, 2009. (Paper 73). On October 9, 2009, however, she filed an unopposed motion requesting an enlargement of time in which to respond. (Paper 73). The court granted this motion on the same date. (Paper 74).

On October 22, 2009, Plaintiff filed a second motion for an extension of time due to the death of a family member. (Paper 77). The court granted an extension of the deadline to October 27, 2009. On October 30, Plaintiff filed a motion to extend the deadline until the end of the day. (Paper 79). The motion was granted later that day (paper 80), and Plaintiff filed her opposition papers shortly before midnight (paper 85, at 2). On November 2, 2009, Plaintiff filed "Errata" oppositions that augmented her arguments and attached exhibits. (Papers 83, 84). The "Errata" opposition to Defendant Giant's motion for summary judgment was three pages longer than the original opposition. On November 3, 2009, Defendants filed a joint motion to strike Plaintiff's "Errata" oppositions as untimely amendments. (Paper 85). On November 20, 2009, Plaintiff filed her opposition to Defendants' motion to strike. (Paper 88).

## II.  Defendants' Motion to Strike

Defendants jointly moved to strike Plaintiff's "Errata" filings as untimely.  Defendants claim the filings substantively changed the arguments in Plaintiff's memoranda, thus qualifying as amendments.  Plaintiff does not contest that the changes were substantive and, in fact, concedes that she failed to complete her opposition papers by the October 30 deadline.  (*See* Paper 88 at ¶ 2).  In light of Plaintiff's concession, the late filings constituted an attempt to complete the unfinished oppositions and should not be considered "errata."  Plaintiff now requests an enlargement of time to file her completed oppositions out of time.  (Paper 88, ¶ 9).

Requests for an extension after a deadline has passed are governed by Fed.R.Civ.P. 6(b)(1)(B), which provides that a court may "extend the time [to file] on motion made after the time has expired if the party failed to act because of excusable neglect."  The Fourth Circuit has noted that "'[e]xcusable neglect' is not easily demonstrated, nor was it intended to be." *Thompson v. E.I. DuPont de Nemours & Co.*, 76 F.3d 530, 534 (4th Cir. 1996).  In deciding whether neglect is excusable, "the determination is . . . an equitable one, taking account of all relevant circumstances surrounding the party's omission," including "the danger of prejudice to the [nonmoving party], the

15

length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993). "The most important of the factors identified in *Pioneer* for determining whether 'neglect' is 'excusable' is the reason for the failure to file [before the deadline]." *Thompson*, 76 F.3d at 534.

Plaintiff gives as reason for the late filings the "accumulated workload related to the personal loss [of a family member] and the efforts to submit the additional material before the deadline." (Paper 88, ¶ 2). She also references reviewing "voluminous exhibits" and "the responsibilities of opposing two large entities." (*Id.* at ¶¶ 5, 7). Prior to filing her "Errata," Plaintiff had already requested and been granted three enlargements of time. To the extent that her untimely filing is the result of a heavy caseload or a difficult case, Plaintiff's neglect is not excusable. *See Pioneer*, 507 U.S. at 398 ("[W]e give little weight to the fact that counsel was experiencing upheaval in his law practice at the time."); *Morris-Belcher v. Housing Auth.*, No. 1:04CV255, 2005 WL 1423592, at *4 (M.D.N.C. June 17, 2005) ("The fact that Plaintiff's counsel has a busy

caseload and that this case involved four plaintiffs and 'several boxes of documents' does not establish excusable neglect."). Nevertheless, in light of the recent passing of a family member of Plaintiff's counsel and the minimal delay caused by the late filing, Plaintiff's request for enlargement of time will be granted.[1]

## III. Defendants' Motions for Summary Judgment

### A.    Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P 56(f); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). In other words, if there clearly exists factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

---

[1] The court has reviewed Plaintiff's "Errata" filings and determined that the additional material contained in them does not change the disposition of Defendants' Motions for Summary Judgment.

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 550 U.S. 372, 377 (2007); *Emmett,* 532 F.3d at 297. A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. *Celotex Corp.*, 477 U.S. at 323. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Id*. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 254; *Celotex Corp*., 477 U.S. at 324. "A mere scintilla of proof, however, will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249-50. (citations omitted).

**B.   Defendant Giant's Motion for Summary Judgment**

In her amended complaint, Plaintiff alleges discriminatory treatment in the form of disparate discipline under Section 1981 and the ADEA.  (Paper 21, ¶¶ 12, 22).

Section 1981 provides that

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  Traditionally, § 1981 has been used to redress racial discrimination.  *See Ana Leon T. v. Federal Reserve Bank*, 823 F.2d 928, 931 (6th Cir. 1987).

Section 623(a)(1) of the ADEA provides, in pertinent part:

> It shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.

Plaintiff has put forth no direct evidence of intentional discrimination surrounding her employment at Giant; therefore, she must proceed under the three-step procedure outlined in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[2] As the

*McDonnell Douglas* framework applies to discrimination claims

under both § 1981 and ADEA, *see Love-Lane v. Martin*, 355 F.3d

766, 786 (4th Cir. 2004); *Hill v. Lockheed Martin Logistics

Mgmt.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc) (Section

1981), *cert. dismissed*, 543 U.S. 1132 (2005) (ADEA), the

following analysis governs both claims.

Under the *McDonnell Douglas* framework, the plaintiff must

first establish a *prima facie* case of discrimination. *See

McDonnell Douglas*, 411 U.S. at 802; *Bryant v. Bell Atl. Md.,

Inc.*, 288 F.3d 124, 133 (4th Cir. 2002). If a plaintiff

establishes a *prima facie* case of discrimination through

circumstantial evidence, the burden of production then shifts to

the defendant to provide a legitimate, non-discriminatory reason

_____

[2] In its motion, Defendant Giant cites the Supreme Court's
decision in *Gross v. FBL Financial Servs., Inc.*, 129 S.Ct. 2343
(2009), for the proposition that a plaintiff asserting an ADEA
claim must prove she would not have been disciplined but for her
age. The *Gross* decision did clarify the burden of persuasion *at
trial* for an ADEA plaintiff. At the summary judgment stage,
however, decisions rendered by federal courts post-*Gross* have
continued to apply the *McDonnell Douglas* framework. *See
Thornton v. Balt. City Bd. of Sch. Com'rs*, Civ. No. WMN-07-1555,
2009 WL 3767090, at *5 (D.Md. Nov. 9, 2009) (citing *Ferrugia v.
Sharp Electronics Corp.*, Civ. No. 05-5992 (D.N.J. Aug. 25,
2009)). As Plaintiff cannot meet the burden under *McDonnell
Douglas*, there is no need to consider the higher standard of
but-for causation. There is also no need to consider
Defendant's argument that the holding of *Gross* should be
extended to Section 1981.

for the differential treatment. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *McDonnell Douglas*, 411 U.S. at 802. The plaintiff must then "'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 253). In the end, "[t]he plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against her." *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (citing *Burdine*, 450 U.S. at 253).

To establish a *prima facie* case of disparate discipline, a plaintiff must show (1) she is member of a protected class; (2) the prohibited conduct in which she engaged was comparable in seriousness to misconduct of employees outside the protected class; and (3) disciplinary measures enforced against her were more severe than those enforced against other employees.[3] *See*

---

[3] Defendant Giant contends that in cases involving demotion, a court must follow the original four-step *prima facie* case described in *McDonnell Douglas*. (Paper 87, at 6). This argument is unfounded. The *McDonnell Douglas* Court expressly anticipated alterations to its *prima facie* formulation under different factual circumstances. *See Moore v. City of Charlotte*, 754 F.2d 1100, 1105 (4th Cir. 1985) (citing *McDonnell Douglas*, 411 U.S. at 802 n. 13). The Fourth Circuit, after

21

*Settle v. Baltimore County*, 34 F.Supp.2d 969, 991-92 (4th Cir.
1999) (citing *Moore v. City of Charlotte*, 754 F.2d 1100, 1105-06
(4th Cir. 1985) (adapting the *McDonnell Douglas* framework in the
employee discipline context)).   Plaintiff must show that her
comparators were similarly situated in all respects, and
although the other employees at Giant need not have engaged in
"precisely the same set of work-related offenses occurring over
the same period of time and under the same sets of
circumstances," *Cook*, 988 F.2d at 511, the similarity between
"comparators and the seriousness of their respective offenses

---

adapting the *McDonnell Douglas* framework to the circumstances of
employee discipline, proceeded to apply it where a plaintiff
suffered a prolonged suspension and subsequent demotion.  *Id.* at
1103.   Defendant Giant fears that the three-step *prima facie*
requirement allows plaintiffs to avoid the traditional
requirement of proving they were meeting their employers'
legitimate job expectations "by simply characterizing
[employment actions] as 'disciplinary actions.'"  (Paper 87, at
6 n. 3).   The *McDonnell Douglas* framework is not so rigid,
however.   In *Burdette v. FMC Corp.*, 566 F.Supp. 808, 816
(S.D.W.Va. 1983), the court explained that the second factor,
requiring proof of employee qualifications (or, in this case,
satisfactory performance), was dropped from the *prima facie*
formulation in a discipline action because where a plaintiff is
already employed by the defendant "a demonstration of
Plaintiff's qualifications is more appropriate as proof of the
pretextual nature of Defendant's justification than as a part of
her initial burden."   The *prima facie* case is intended merely to
raise the inference of discrimination, and the exclusion of an
element from the initial burden does not remove it entirely from
consideration.   *Id.*  Ultimately it is the plaintiff who bears
the burden to prove intentional discrimination.   *See id.*
Indeed, Defendant Giant raises Plaintiff's job performance as a
legitimate, nondiscriminatory reason for her demotion.

must be clearly established." *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008). "To be similarly situated the employees must have been disciplined by the same supervisor." *McDougal-Wilson v. Goodyear Tire and Rubber Co.*, 427 F.Supp.2d 595, 610 (E.D.N.C. 2006) (citing *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000)).

Plaintiff meets the first requirement because, as an African-American woman over the age of 40, she is a member of a protected class. Plaintiff cannot, however, meet the second requirement of showing that her conduct was similar to comparators outside the class.

As Bakery Manager, Plaintiff was covered by the regulations outlined in the Bakery Department Policy on Dating and Shelf Life prohibiting the sale of bakery products past the "sell-by" date and requiring Bakery Managers to reduce the price of products prior as that date neared. Plaintiff's relevant conduct consisted of violating company policy by having outdated bakery products on the sales floor. (Paper 72, at 6-7).

Plaintiff points to four potential comparators who suffered suspensions of less than eleven days and were not demoted for violations regarding outdated food: Teresa Adkins, Alan Sutphin, Robin Hannifin, and Sheila Wright. All four are Caucasian and

younger than Plaintiff and are therefore valid comparators.[4] None, however, were Bakery Managers, or even Department Managers, who left outdated food on the sales floor.

Neither Ms. Hannifin nor Ms. Adkins was a Department Manager. Ms. Hannifin worked as a Service Deli Lead and Ms. Adkins as a Starbucks Kiosk Lead. (Paper 87, at 10-11, 13). Neither can be considered a similarly situated comparator because neither was subject to the same standards of performance applicable to a Bakery Manager. *See Forrest v. Transit Mgmt. of Charlotte, Inc.*, 245 Fed.Appx. 255, 257 (4th Cir. 2007) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)

---

[4] Comparators in age discrimination cases are required to be "substantially younger" than the plaintiff. *See O'Connor v. Consolidated Coin Caterers Corporation*, 517 U.S. 308, 313 (1996). Mr. Sutphin is approximately 50-years old, Ms. Adkins is 44 years old, Ms. Hannifin is 56 years old, and Sheila Wright is under 40 years of age. (Paper 72, at 33-34; Paper 87, at 12-13). The court will assume without deciding that, at nine years younger than Plaintiff, Ms. Hannifin is "substantially younger." *See DeBord v. Washington County School Board,* 340 F.Supp.2d 710, 714 (W.D.Va. 2004) ("[T]he greater the age disparity between a replacement and a terminated employee, the stronger the inference of discrimination."); *see also Jeffers v. Thompson,* 264 F.Supp.2d 314, 328 (D.Md. 2003) (A replacement eleven years younger is substantially younger, while one five years younger probably is not). *But see Hoffmann v. Primedia Special Interest Publications,* 217 F.3d 522, 524 (7th Cir. 2000) (holding that a ten year difference in age is presumptively substantial, while a difference of less than ten years is presumptively insubstantial).

(employees must be subject to the same standards to be comparable)).

Mr. Sutphin, a Produce Manager, was disciplined for having $3,000 worth of outdated produce in the stockroom cooler. While the sum of Giant's loss exceeded that of Plaintiff by tenfold, the food was not accessible to the public. Selling outdated food violates Giant company policy because it puts customers' health at risk and could damage the company's reputation and goodwill. (Paper 72, at 6). It is reasonable to believe that Defendant Giant perceives the selling of outdated food to customers as a greater violation than storing outdated food in the stockroom. (*Id.* at 32).

Sheila Wright, a Bakery Manager, was never disciplined for selling outdated products. Ms. Wright's assistant, Laura Steinbach, testified that when she found outdated products in the Bakery, the products would be entered into the known-loss-tracking ("KLT") system and thrown away. (Paper 84, at 8-9). According to Plaintiff, it is, therefore, "undisputed that management is fully informed." (*Id.* at 10). But Plaintiff has produced no evidence that the KLT data available to management showed that Ms. Wright sold outdated products, nor has she shown that Mr. Hicks ever looked at the KLT. Plaintiff must prove that Mr. Hicks had actual knowledge of Ms. Wright's alleged

violations and consciously overlooked them.  *See Duggan v. Sisters of Charity Providence Hospitals*, 663 F.Supp.2d 456, 463 (D.S.C. 2009).  Constructive knowledge is insufficient.  *Id.*

Plaintiff alleges that Ms. Hannifan and Ms. Wright have a history of missing profit and inventory goals but were only issued verbal or written warnings.  (Paper 84, at 8).  This is not evidence of discrimination, however, as Plaintiff herself only received a written warning for low gross profit.  It was not until Plaintiff left outdated food on the sales floor that she was suspended and demoted.

Even if Plaintiff could prove a *prima facie* case, Defendant Giant has offered her history of poor job performance as a legitimate, nondiscriminatory reason for her suspension and demotion.  Mr. Hicks testified that, prior to the incident with the outdated macaroons, he witnessed the poor conditions of the bakery on multiple visits.  Both the Bakery Sales Manager and Human Resources Manager confirmed that Plaintiff had a history of poor job performance.  Indeed, Plaintiff received a disciplinary notice in November 2006, only three months before her demotion, specifically warning that she could lose her position as Bakery Manager.  The details surrounding the disciplinary action support Defendant Giant's reasons (paper 72,

at 13-14), and Mr. Hicks reasonably considered the evidence of poor performance to be negligence (paper 72, at 13).

Plaintiff has not refuted any of Defendant's evidence as to her poor job performance, nor has she otherwise attempted to defend against Giant's claims regarding her performance. While she does point to testimony that outdated grocery products are regularly discovered in the Grocery Department without any disciplinary actions (paper 84, at 11), Giant has explained that the size of the Grocery Department makes these audits necessary (paper 87, at 19). As the manager of a small department, the Bakery Manager is expected to stay abreast of which products are approaching the sell-by date, reduce the price as that date approaches, and remove them before the sell-by date expires. (*Id.*). By contrast, the most effective way to find and remove outdated Grocery Products is through periodic audits. (*Id.*). Plaintiff has produced no evidence that Defendant Giant's proffered reasons for her demotion of poor performance were pretextual.

In the complaint, Plaintiff asserts that she was replaced by an employee outside of her protected class. (Paper 21, ¶¶ 14, 21). To the extent that she may claim discrimination based on this replacement, Giant's legitimate reasons for suspending and demoting Plaintiff apply equally to the replacement.

Plaintiff has produced no evidence of even a hint of discriminatory intent by either Defendant Giant or Mr. Hicks. The only relevant suggestion of discrimination consists of a comment from an Assistant Store Manager about wanting to get rid of older contract employees. Plaintiff herself admits this term refers to seniority status rather than age. (Paper 72, at 43).

For the above reasons, Defendant Giant's motion for summary judgment will be granted.

**C.    Defendant UFCW's Motion for Summary Judgment**

In the amended complaint, Plaintiff alleged disparate treatment in violation of § 1981 and the ADEA. Plaintiff, however, has provided no direct evidence that Defendant UFCW intentionally discriminated against her. Therefore, she must utilize the *McDonnell Douglas* framework. *See McDonnell Douglas*, 411 U.S. at 802-805, *supra*.

To establish a *prima facie* case of disparate treatment against a union, a union member can introduce evidence that the member was "singled out and treated less favorably" than members outside of her protected class. *See Beck v. United Food and Commercial Workers Union, Local 99*, 506 F.3d 874, 882 (9th Cir. 2007) (citing *Gay v. Waiters' & Dairy Luncheon's Union*, F.2d 531, 537 (9th Cir. 1982)); *Byrd v. The Baltimore Sun Co.*, 279 F.Supp.2d 662, 673 (D.Md. 2003), *aff'd*, 110 Fed.Appx. 365 (4th

28

Cir. 2004) (summary judgment granted to union on Title VII and §
1981 claims where plaintiff provided "no evidence that other
union members were treated differently in similar
circumstances"). Plaintiff cannot establish a *prima facie* case
because she cannot demonstrate that similarly situated
comparators were treated differently by Defendant UFCW during
the representation of their grievances.

Plaintiff proposes two comparators: Ms. Adkins and Mr.
Sutphin. Ms. Adkins was suspended for three days for a poor
Starbucks kiosk audit. Mr. Sutphin was suspended for two days
for having outdated produce in the stockroom cooler. Mr. Burton
represented Ms. Adkins, while Mr. Sutphin's union representative
was Rex Trabue. Both UFCW representatives attended the initial
grievance meeting and, in both cases, Giant did not reverse or
reduce the suspension. Defendant UFCW did not pursue either
grievance beyond the first step.

Plaintiff primarily contends that Defendant UFCW's
representation of her differed from her comparators because the
UFCW representatives: (1) filed a written grievance for Ms.
Adkins and Mr. Sutphin, and (2) were more aggressive in arguing
for reduced suspensions for the others. Plaintiff also argues
that Mr. Burton's failure to grieve the November 2006 written
reprimand constitutes discriminatory treatment.

Plaintiff cannot demonstrate any difference between Defendant UFCW's representation of her grievance and those of her comparators. First, the written grievance is simply an intake form used to start the grievance process. (Paper 86, Attach. 1, at 35). Mr. Burton testified that a written grievance is necessary only to take a grievance to arbitration, and he had thirty days to file one, if necessary. (*Id.* at 253). Plaintiff has produced no evidence that a written grievance is required by the CBA at the initial stage. The grievance process begins with the meeting between management, the grievant, and the Union Business Representative. (*Id.* at 29). In Plaintiff's case, instead of filing a written grievance, Mr. Burton began the grievance process by calling the Human Resources Manager. It is undisputed that she had a grievance meeting, just as the other employees did, and a UFCW representative attended each meeting.

Plaintiff contends that because Mr. Burton challenged the suspensions of Ms. Adkins and Mr. Sutphin, he should have also asked Ms. Anderson to reduce Plaintiff's suspension. (Paper 83, at 11). Mr. Burton, however, testified that Mr. Sutphin and Ms. Adkins served finite suspensions and the meetings were initiated to challenge those suspensions. (Paper 71, at 29-31). At Plaintiff's meeting, by contrast, Mr. Burton hoped to save her

job and return her to work. Additionally, Plaintiff was given
the opportunity to speak in her own defense and could have
challenged the suspension herself, but did not. (*Id.* at 30).

After the meeting, the employer refused to overturn the
suspensions of either Plaintiff or her comparators. It is at
this stage that a written grievance – a prerequisite for
arbitration – becomes relevant. Defendant UFCW, however, not
the grievant, decides whether to pursue a grievance, and, in
each of these cases, it refused to take the grievance to
arbitration. (Paper 71, at 33). The grievance procedure
therefore ended for Plaintiff when she agreed to Giant's offer.
After her acceptance, Mr. Burton had no need to file a written
grievance.

To the extent Plaintiff argues that Mr. Burton should have
rejected the terms of Giant's offer and demanded a shorter
suspension, Plaintiff herself accepted the offer. She never
told Mr. Burton that she would not accept the decision and never
asked Mr. Burton to refuse the offer.

The argument that Mr. Burton did not tell Plaintiff her
options also fails. Plaintiff was responsible for knowing her
options; Union representatives are not required to explain the
grievance procedures. *See Smith v. Drug, Chemical, Cosmetic,*
*Plastics and Affiliated Indus. Warehouse Employees Local 815,*

943 F.Supp. 224, 240 (E.D.N.Y. 1996). Additionally, Plaintiff failed to demonstrate a similar situation where Defendant UFCW did explain the grievance procedures to an employee.

Plaintiff's additional allegations regarding the quality of Defendant UFCW's representation of her grievances fail to establish a *prima facie* case for disparate treatment because Plaintiff produces no comparators. For example, Plaintiff contends that Mr. Burton's failure to grieve her 2006 Disciplinary Notice and Defendant UFCW's failure to respond to her letter to the Union President constitute discrimination. In neither claim does Plaintiff demonstrate that Defendant UFCW provided different treatment to a similarly situated employee. Plaintiff, in fact, did not ask either Mr. Burton or President Lowthers to initiate a grievance.

Even if Plaintiff could prove a *prima facie* case, Defendant UFCW has a legitimate nondiscriminatory reason for not continuing with the grievance. Plaintiff accepted the settlement and did not ask Defendant UFCW to pursue her grievance any further. Mr. Burton testified that he found the decision satisfactory because Plaintiff retained her job. Because Plaintiff admitted to having the outdated food on the floor, a terminable offense, and she had a history of poor job performance, it was not unreasonable for the Union to refuse to

risk taking the grievance to the next step. (Paper 86, at 12-13). Plaintiff has produced no evidence that this was not a terminable offense or otherwise suggesting that Mr. Burton should not have accepted the settlement.

Plaintiff, in fact, weakens her own case by alleging that Mr. Burton is "known for his failure to provide timely and effective representation in initial grievance processes." (Paper 83, at 14). Mr. Scheid's testimony that "it would require weeks at a time before [Mr.] Burton would visit store 162 to initiate grievances" has a similar effect. (*Id.*). These allegations suggest that Mr. Burton, rather than altering his representation according to an employee's age or race, is simply not effective as a union representative.

Although Plaintiff dropped the charge of collusion from the amended complaint, she raised it in response to Defendant UFCW's motion for summary judgment, so that charge will be briefly discussed. Plaintiff has produced no evidence of collusion between Defendant Giant and Defendant UFCW. First, Mr. Burton and Mr. Hicks both testified that they did not collude. Statements "denying any union involvement or collusion are 'sufficient to put the burden on plaintiff to come forward with admissible evidence from which a reasonable finder of fact could find collusion.'" *Wright v. Boeing Vertol Co.*, 704 F.Supp. 76,

81 (E.D.Pa. 1989) (citing *Brown v. Trans World Airlines, Inc.*, 746 F.2d 1354, 1360 (8th Cir. 1984)). Plaintiff has not met this burden. She alleges that Mr. Burton was informed that Ms. Mason was targeting Tier 1 older contract employees and failed to intervene. Defendants, in response, produced evidence that the term "Tier 1 employee" referred to seniority status, not age. Plaintiff's additional evidence consists merely of allegations that certain Tier 1 employees filed age discrimination claims. (Paper 83, at 14). The fact that an employee files a discrimination claim, however, is not itself evidence of collusion.

Plaintiff cannot prove a *prima facie* case of discriminatory treatment, nor can she prove that Defendant UFCW's reason for not pursuing her grievance was pretext for discrimination. Defendant UFCW's motion for summary judgment will be granted.

## IV. Conclusion

For the foregoing reasons, Defendants' joint motion to strike will be denied, Defendant Giant's motion for summary judgment will be granted, and Defendant UFCW's motion for summary judgment will be granted. A separate order will follow.

/s/
DEBORAH K. CHASANOW
United States District Judge